The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Richard Gene GALLEGOS, Defendant-Appellant.

No. 80SA252.

Supreme Court of Colorado, En Banc.

April 26, 1982.

---

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Maureen Phelan, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Michael L. Bieda, Monte Vista, A. Frank Gallegos, St. Paul, Minn., for defendant-appellant.

J. Gregory Walta, Colo. State Public Defender, James England, Deputy State Public Defender, Denver, for amicus curiae Colorado State Public Defender.

Francis K. Culkin, Denver, for amicus curiae American Civil Liberties Foundation, Inc.

DUBOFSKY, Justice.

The defendant, Richard Gene Gallegos, appeals his convictions in the Mesa County District Court of second-degree sexual assault under section 18–3–403, C.R.S.1973 (1978 Repl.Vol. 8); attempted first-degree sexual assault under sections 18–3–402 and 18–2–101, C.R.S.1973 (1978 Repl.Vol. 8); false imprisonment under section 18–3–303, C.R.S.1973 (1978 Repl.Vol. 8); and of being an habitual criminal under section 16–13–101(2), C.R.S.1973 (1978 Repl.Vol. 8; current version in 1981 Supp.).[1] He was sen-

---

1. This case was transferred from the Court of Appeals under sections 13–4–110(1)(a) and 13-4-102(1)(b), C.R.S.1973 because the defendant challenges the constitutionality of the habitual criminal statute, section 16–13–101(2), C.R.S.

tenced to two concurrent terms of life imprisonment in the state penitentiary.[2] The grounds for his appeal are that the trial court erred in denying him discovery of portions of a letter written by the victim to the prosecuting attorney and that testimony of an investigating police officer was improperly admitted. He also contends that the habitual criminal statute is unconstitutional. We disagree and affirm the defendant's convictions.

On April 8, 1979, the defendant offered a ride to the victim, who was walking along business route 70 in Palisade on her way to work in Grand Junction. The victim accepted, and the defendant drove toward Grand Junction until he turned off on a deserted side road to go to the bathroom. When the defendant returned to the car, he grabbed the victim and began fondling her breasts while holding her tightly around the neck. The victim struggled, kicked the car door open and repeatedly honked the car's horn. The defendant managed to insert his finger in the victim's vagina before another vehicle pulled up behind the defendant's car. At the arrival of the other vehicle, the defendant desisted and drove to Grand Junction. When he stopped the car at a red light, the victim jumped out, took down the car's license number and immediately telephoned the police from a nearby gas station. The police investigator who interviewed the victim shortly after the attack testified that she had red marks on her neck and throat and torn underpants.

The defendant's version of the incident was that the victim had asked him to take her to buy a pair of shoes before dropping her off at work. When the defendant refused to be her "taxi cab," the victim became violent and began kicking the defendant's stereo, requiring him to physically restrain her. The jury found the defendant guilty as charged.

I.

Before trial, the district attorney notified the defendant's attorney that he had received a letter from the victim, who had moved out of Colorado after the assault, stating her current address. The defendant moved for discovery of the letter under Crim.P. 16 I(a)(1)(I) [3], alleging that it might contain relevant information. At the hearing on the discovery motion, the district attorney read the following portion of the victim's letter into the record:

Hello, Mr. Farina. I am puzzled. I really don't know what to do. I found myself with no place to live in Grand Junction. I moved back to Ritzville to my mom's. I found a house and have rented it. I really don't want to let him get away with what he's done. But I don't know how I'm going to be there the 20th. I'm on welfare and haven't know [sic] way to earn any money.

The district attorney omitted reading the concluding sentences of the letter, which he said related to a personal matter which he didn't think was exculpatory. The district

1973 (1978 Repl.Vol. 8; current version in 1981 Supp.).

**2.** The defendant was charged with and convicted of attempted first-degree sexual assault, second-degree sexual assault, and false imprisonment for a single incident. Subsequently, the trial court imposed concurrent life sentences for the convictions of attempted first-degree sexual assault and second-degree sexual assault, and a term of six months for the false imprisonment conviction. The defendant did not challenge at trial or on appeal the propriety of the convictions for both attempted first-degree sexual assault and second-degree sexual assault on the facts of this case, see section 18-1-408, C.R.S.1973; neither did he question the imposition of concurrent life sentences under the habitual criminal act for the convictions

of each of the felony sexual assault counts. Therefore, we do not address the legality of the multiple convictions or sentences, but note that the defendant may challenge them under Crim.P. 35.

**3.** Crim.P. 16 I (a)(1)(I) states in pertinent part:
(1) [T]he prosecuting attorney upon request of the defense counsel shall disclose to the defense counsel the following material and information which is in the possession or control of the prosecuting attorney:
 (I) The names and addresses of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial, together with their relevant written or recorded statements....

attorney produced the letter to the court for *in camera* inspection. The court ruled that the omitted portion was not relevant or exculpatory and refused to compel discovery.

The omitted portion of the letter reads: "In my fifth month of P.G. [pregnancy]. I'm due Feb. 4. Please write and tell me what to do! Thank you." The offense occurred on April 8, 1978, and the letter in which the victim stated she was five months pregnant was postmarked October 4, 1978, from which it could be concluded that conception had occurred approximately one month after the offense. This, and the fact that no intercourse took place during the assault, led the district attorney and the court to conclude that the information was irrelevant.

The defendant did not learn the contents of the withheld portion of the letter until reading it in the Attorney General's brief to this Court. In his briefs, the defendant argues that the excised portion of the letter should have been disclosed under Crim.P. 16 I(a)(1)(I) regardless of its contents because that provision calls for disclosure to defense counsel of the "relevant written or recorded statements" of witnesses, and it is a defense function to determine the relevance of witness statements. At argument, after learning the contents of the excised portion, the defendant's attorney asserted specifically that the excised portion may have been relevant to the victim's credibility as a witness in that the victim was not pregnant when she appeared at trial on February 27 through March 1, 1979. Although the victim stated in her letter, "I'm due Feb. 4," and this would appear the most logical explanation for her appearing not pregnant at trial, defense counsel nevertheless argued that she may have lied about being pregnant in her letter to the district attorney.

Disclosure of relevant statements upon defense motion is no longer discretionary with the trial court as was the case prior to the adoption of the present Crim.P. 16. *See People v. Smith*, 185 Colo. 369, 524 P.2d 607 (1974); *People v. District Court*, 172 Colo. 23, 469 P.2d 732 (1970). Under the current rule, such disclosure is mandatory. Therefore, the sole issue on review is whether the victim's statement to the district attorney that she was five months pregnant was relevant.

▇ Relevance as used in Crim.P. 16 I(a)(1)(I) embodies a broad standard of disclosure. *See* 2 *A.B.A. Standards for Criminal Justice* 11–2.1 (2d ed. 1980). A witness statement, to be relevant, need not contain information admissible at trial, as long as the contents of the statement are relevant to the conduct of the defense. Generally, defense counsel is the appropriate party to make that determination. *See A.B.A. Standards, supra*, Commentary at 11.15. As we noted in *People v. Smith*, 185 Colo. 369, 524 P.2d 607 (1974),

> In certain cases even an *in camera* hearing imposes unfairness on the defense, as only the defense can determine what will be material and helpful to its case. *See Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176.

524 P.2d at 611.

▇ Nevertheless, the term "relevant" used in Crim.P. 16 I(a)(1)(I) is more than mere surplusage; the prosecution is not obliged in every case to disclose the entire contents of its file. In *People v. McKnight*, Colo., 626 P.2d 678 (1981), we contrasted the language of Crim.P. 16 I(a)(1)(I) with that of Crim.P. 16 I(a)(1)(II), which requires disclosure of "Any written or recorded statements and the substance of any oral statements made by the accused...." We pointed out that subparagraph (II) contains no requirement of relevancy and thus mandates broader disclosure of statements made by an accused than is mandated by subparagraph (I) with respect to witness statements. We described the standard of disclosure for an accused's statements as encompassing "*every* statement made by the accused ... which relates in any way to the series of events from which the charges pending against the accused arose...." 626 P.2d at 680 (emphasis in original). Clearly then, Crim.P. 16 I(a)(1)(I) does not require disclosure of *every* witness statement which relates to the events giving rise

to criminal charges, but only to those statements *relevant* to the issues in the case.

■ Under the Colorado Rules of Evidence, the issue of relevance is resolved by determining whether the evidence tends to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. C.R.E. 401.[4] Here, the fact that the victim became pregnant approximately one month after the assault would not tend to prove or disprove any fact that is of consequence to the defendant's guilt or innocence. The victim's subsequent pregnancy had no bearing on the acts charged, since penetration was not alleged to have occurred, or on the defendant's defense, which was a denial that he committed the offenses charged.

■ Neither would evidence of the victim's subsequent pregnancy be admissible to impeach her credibility as a witness. In the past, defense counsel in a sexual assault case was accorded wide latitude in cross-examining the prosecutrix. *See Struna v. People*, 121 Colo. 348, 215 P.2d 905 (1950); 3A *J. Wigmore, Evidence* § .929a (Rev. ed. 1970). However, the more modern rejection of the view that all evidence of sexual behavior is probative of a victim's credibility as a witness, and the recognition that the introduction of such evidence may confuse the jury, prejudice the prosecution's case and discourage victims from reporting and prosecuting sexual assaults led to the enactment in 1975 of Colorado's "rape shield" statute, section 18–3–407, C.R.S.1973 (1978 Repl.Vol. 8). *See People v. McKenna*, 196 Colo. 367, 585 P.2d 275 (1978). It provides:

(1) Evidence of specific instances of the victim's prior or subsequent sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall be presumed to be irrelevant except:

(a) Evidence of the victim's prior or subsequent sexual conduct with the actor;

(b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or any similar evidence of sexual intercourse offered for the purpose of showing that the act or acts charged were or were not committed by the defendant.

Since there is no allegation that the victim's pregnancy resulted from the sexual assault, section 18–3–407(1)(b), which exempts from the general presumption of irrelevance "evidence . . . showing the source or origin of . . . pregnancy . . . offered for the purpose of showing that the act or acts charged were or were not committed by the defendant," is inapplicable. *See also People v. Martinez*, Colo., 634 P.2d 26 (1981).

■ The defendant contends that even if the fact of the victim's subsequent pregnancy was not admissible evidence in itself, it might have led to the discovery of admissible evidence useful for impeachment of the victim's credibility, which was a key issue. Thus, the defendant argues, nondisclosure still violated Crim.P. 16 and also abridged his due process right to a fair trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny.

In *Brady v. Maryland, supra*, the United States Supreme Court held that the due process clause of the Fifth Amendment to the U. S. Constitution requires the prosecution to disclose evidence favorable to the defendant upon request by defense counsel. The *Brady* due process right applies to trials in state courts under the Fourteenth Amendment. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *People v. Smith, supra*, we quoted with approval Justice Fortas' concurrence in *Giles v. State of Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), requiring that a court compel discovery not only of favorable evidence but of any evidence "which may . . . be of material importance to the defense—regardless of whether it relates to testimony which the state has caused to be given at trial . . . ." 524 P.2d

---

4. The Colorado Rules of Evidence, enacted after the trial in this case, codified the existing relevance standard. *See People v. Martinez,*

Colo., 634 P.2d 26 (1981); *Bush v. Jackson*, 191 Colo. 249, 552 P.2d 509 (1976).

at 611 *quoting* 386 U.S. at 100, 87 S.Ct. at 810. *Accord, People v. Thatcher*, Colo., 638 P.2d 760, 768 (1981).

Cases since *Brady* have mandated reversal on the basis of failure to disclose certain information to the defendant only where the information might have affected the outcome of the trial. *United States v. Agurs, supra; Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). *See Goodwin v. District Court*, 197 Colo. 6, 588 P.2d 874 (1979). In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court noted that due process does not "automatically require a new trial whenever 'a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict ....'" *Id.* at 154, 92 S.Ct. at 766.

Here, looking at the possible usefulness of the victim's statement in the most expansive light possible, we cannot conclude that it was, or would have led to the discovery of, material information not already known to the defendant. The defendant has no basis for his contention that the victim may have been lying about being pregnant other than that she was not obviously pregnant at trial. In any case, the

victim's statement that she was five months pregnant as of October 4, 1978, is consistent with her pregnancy having come to term prior to trial at the end of February. Likewise, we are unconvinced that the victim's statement might have led to other information useful for impeachment. In *People v. Thatcher, supra*, we held that where information in the possession of the prosecution "would have added little, if anything to the defense counsel's information and effectiveness during cross-examination," failure to disclose the information was harmless error beyond a reasonable doubt. 638 P.2d at 768. In this case, defense counsel vigorously cross-examined the victim with the aim of impeaching her credibility. The knowledge that she had informed the district attorney five months previously that she was pregnant, itself clearly inadmissible, cannot have benefitted the defendant's attorney in his cross-examination. We conclude that the defendant's due process rights were not abridged by his lack of access to the victim's statement concerning her pregnancy.[5]

## II.

The defendant next contends that the district court erred in admitting certain

---

**5.** We note the similarities between the instant case and *Giles v. State of Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). In *Giles*, the defendants, convicted of sexual assault of an adolescent girl, alleged denial of due process because the prosecution failed to disclose to defense counsel evidence, known to the prosecution, concerning incidents which occurred about one month after the crime charged. Apparently, the victim had sexual relations with two men at a party, filed rape charges against them, and then dropped the charges. Within hours of the incident at the party, the victim attempted suicide and was hospitalized for psychiatric examination. The victim's testimony was of paramount importance in convicting the defendant. The plurality opinion in *Giles* did not address the issues raised by the suppressed evidence, instead disposing of the case on the issue of the prosecution's bad faith in allowing false testimony to go uncorrected. In his concurring opinion, Justice Fortas wrote that the suppression of the evidence concerning incidents which occurred after the assault was a violation of the defendants' due process rights. This Court has quoted Justice Fortas' concurrence in *Giles* with

approval on a number of occasions. *E.g., Goodwin v. District Court*, 197 Colo. 6, 588 P.2d 874 (1979); *People v. Smith*, 185 Colo. 369, 524 P.2d 607 (1974); *People v. Walker*, 180 Colo. 184, 504 P.2d 1098 (1973); *Cheatwood v. People*, 164 Colo. 334, 435 P.2d 402 (1968). There are, however, important differences between the evidence at issue in the instant case and in *Giles*. As Justice Fortas pointed out, although the implications of the information concerning the victim's subsequent sexual encounter were highly debatable, the information that the victim had had intercourse with two men in circumstances suggesting consent, and then lodged and later retracted rape charges against them could have been material to the defendants' case, especially since their principal defense was consent. Similarly, the victim's suicide attempt and hospitalization might have had a bearing on her credibility as a witness. In the instant case, the evidence concerning the victim's pregnancy had no similar indicia of relevance. It could not have been used for impeachment purposes and did not bear even indirectly on the defendant's theory of defense.

statements made at trial by H. L. Smith, a Mesa County Sheriff's Department investigator. It was Smith to whom the victim first reported the assault. When asked whether it was his conclusion that this was a false report or a legitimate claim, Smith testified, "My first impressions were that it was a legitimate report." The defendant did not object to this testimony at trial or raise it in his new trial motion, but now alleges that it was impermissible hearsay introduced to bolster the victim's testimony and its admission constitutes plain error.

■ In sexual assault cases, testimony tending to prove the promptness of the victim's complaint to the police is admissible corroboration evidence. *Padilla v. People,* 156 Colo. 186, 397 P.2d 741 (1964); *People v. Lowe,* 39 Colo.App. 312, 565 P.2d 1352 (1977). However, permissible police testimony is restricted to the mere fact of the complaint and may not encompass the details related to the investigating officer. *People v. Montague,* 181 Colo. 143, 508 P.2d 388 (1973); *People v. Lowe, supra.* Likewise, it is clearly improper to admit an investigating officer's testimony attesting to the accuracy or credibility of witness statements. Nevertheless, in the context of this trial, the admission of Smith's testimony that he thought the report legitimate does not constitute plain error under Crim.P. 52(b). Where, as here, the jury had an opportunity to evaluate the extensive testimony of the victim, whose credibility was subject to impeachment through cross-examination by defense counsel, the officer's single statement about his "first impressions" of the legitimacy of the report does not rise to the level of plain error under Crim.P. 52(b).

In cross-examining the victim, defense counsel alluded to her having giggled on the witness stand at the preliminary hearing and implied that she had laughed and giggled throughout the hearing and considered it a "big joke." To rebut this implication, the prosecution questioned Smith concerning his impression of the victim's emotional state during her preliminary hearing testimony. After testifying that he had observed a large number of sexual assault victims, Smith stated:

> Basically, [the victim] was very typical of a rape victim in that she—every victim handles this type of situation differently. [She] was kind of, what I would call, a nervous giggle, and this, I felt, was the way she was trying to handle the pressure from this type of event.

> It wasn't, to me, a laughing matter to where she thought the thing was funny. This was, also, she had advised me, her first time to ever be in a courtroom, and she was nervous, and these little giggles weren't a funny-type of giggle; they were just an emotional reaction like some people have nervous reactions, like I do when I move my hands around while I am talking. This was the impression that I got from these giggles.

■ The defendant did not object to this testimony at trial or raise it in his new trial motion. He now contends that its admission was plain error because it was an opinion by a witness not qualified as an expert and because it impermissibly bolstered the victim's credibility as a witness. The record indicates that Smith was not qualified as an expert. However, under C.R.E. 701, opinion testimony by a witness not qualified as an expert is admissible if it is:

> (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of [the witness'] testimony or the determination of a fact in issue.

*See McCormick on Evidence,* § 11 at 22–26 (2d ed. 1972). Prior to the adoption of C.R.E. 701, we held in *Elliott v. People,* 176 Colo. 373, 490 P.2d 687, 689 (1971) that "when a witness has personally observed the physical activity of another, and summarizes his sensory impressions thereof," the witness' conclusions are admissible. The sufficiency of evidence to establish the qualifications and knowledge of a witness to express an opinion based on physical facts he has observed is a question for the trial court, not subject to reversal unless clearly erroneous. *Wise v. Hillman,* Colo., 625 P.2d 364, 367 (1981); *Atencio v. Torres,* 153 Colo. 507, 385 P.2d 659 (1963).

Smith observed the victim testifying at the preliminary hearing. At trial he stated a conclusion based on his sensory impressions from the preliminary hearing in conjunction with his prior knowledge and experience. That Smith based his conclusion in part on his experience as a police officer does not render his testimony inadmissible. *Wise v. Hillman, supra.*

Since defense counsel sought to impeach the victim's credibility through his questions on cross-examination, Smith's testimony, intended to rehabilitate her credibility, was appropriate, and did not constitute impermissible bolstering. *See Pine v. Vigil*, 28 Colo.App. 601, 480 P.2d 868 (1970), *rev'd on other grounds*, 176 Colo. 384, 490 P.2d 934.

### III.

Finally, we consider the defendant's contentions that Colorado's habitual criminal statute, section 16–13–101(2), C.R.S.1973 (1978 Repl.Vol. 8; current version in 1981 Supp.),[6] violates due process and separation of powers under the United States and Colorado Constitutions. At the outset, we emphasize the narrow scope of our inquiry. In prior cases, we upheld the habitual criminal statute against challenges based on a number of grounds including the constitutional guarantees of equal protection, due process, and protection against cruel and unusual punishment. *See People v. Gutierrez*, Colo., 622 P.2d 547 (1981); *People v. Larson*, 194 Colo. 338, 572 P.2d 815 (1977); *People v. Bergstrom*, 190 Colo. 105, 544 P.2d 396 (1977); *People v. Thomas*, 189 Colo. 490, 542 P.2d 387 (1975); *Vigil v. People*, 137 Colo. 161, 322 P.2d 320 (1958). We decline to readdress the issues resolved in these cases.

The defendant's first contention is that the habitual criminal statute violates due process because it provides no opportunity for presentation and consideration of mitigating factors. The defendant contends that such an opportunity is required by the United States Supreme Court decisions invalidating state death penalty statutes which preclude the judge and jury

> from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

(Emphasis in original.) *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 924 (1976). We relied on the principle enunciated in *Lockett* and *Jurek* in *People v. District Court*, 196 Colo. 401, 586 P.2d 31 (1978), to declare Colorado's death penalty statute unconstitutional because it improperly limited introduction of mitigating circumstances in those cases where the defendant maintained his innocence.

However, in *People v. Gutierrez, supra,* we made it clear that the opportunity to present and consider mitigating factors is constitutionally mandated only where the death penalty is involved. There we stated:

> The Eighth and Fourteenth Amendments to the United States Constitution require that consideration be given to evidence of mitigating factors in determining whether a death sentence is to be imposed for commission of a crime. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *People v. District Court*, 196 Colo. 401, 586 P.2d 31 (1978). Those cases are based on the predicate that the death penalty differs qualitatively from any

---

**6.** Section 16–13–101(2), C.R.S.1973 (1978 Repl. Vol. 8), the "big" habitual criminal provision, provides in pertinent part:

> (2) Every person convicted in this state of any felony, who has been three times previously convicted, upon charges separately brought and tried, either in this state or elsewhere, of a felony or, under the laws of any other state, the United States, or any territory subject to the jurisdiction of the United States, of a crime which, if committed within

this state, would be a felony, shall be adjudged an habitual criminal and shall be punished by imprisonment in the state penitentiary for the term of his or her natural life. The jury found that the defendant had been convicted of four previous felonies, first degree criminal trespass, second degree burglary, assault with a deadly weapon, and burglary, and convicted him of being an habitual criminal under section 16–13–101(2), subject to a mandatory life sentence.

other sentence in its severity and irrevocability. *Lockett v. Ohio, supra; People v. District Court, supra.* They have not been applied by the United States Supreme Court or by this court in any other contexts. More particularly, notwithstanding the long history of challenges to habitual criminal statutes in the United States Supreme Court and here, such a requirement has never been adopted or suggested previously. We are persuaded that the uniquely grave nature of the death penalty is the wellspring from which flows the constitutional requirement that mitigating factors be considered in sentencing notwithstanding the number or seriousness of a defendant's prior offenses.

622 P.2d at 556.

The defendant's challenge in *Gutierrez* was based on the constitutional prohibition against cruel and unusual punishment, but no different result is suggested because the defendant in this case grounds his challenge on due process. The Supreme Court recognized in *Lockett v. Ohio, supra,* that "in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes." 438 U.S. at 604–05, 98 S.Ct. at 2964. Where, as here, the General Assembly has mandated a life sentence for an individual who has "demonstrated by his repeated criminal actions that he is unable or unwilling to abide by those limitations on conduct which the legislature has found necessary or appropriate to the functioning of a civilized society," *People v. Gutierrez, supra,* 622 P.2d at 556, the intended public policy is clear, and no constitutional due process right is abridged.

The defendant's second challenge to the habitual criminal statute is that it violates separation of powers principles embodied in *U.S.Const.* Amend. XIV and *Colo.Const.* Art. II, Sec. 25 [7] and Art. V, Sec. 1,[8] by delegating to the district attorney unlimited discretion to charge offenders eligible for prosecution under the statute.

The separation of powers doctrine is founded on the principle that "the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority." *Colorado Anti-Discrimination Commission v. Case,* 151 Colo. 235, 380 P.2d 34, 43 (1962). Nevertheless, it has long been recognized that both the United States and Colorado Constitutions allow the legislative branch of government

the necessary resources of flexibility . . . to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply.

*Panama Refining Co. v. Ryan,* 293 U.S. 388, 421, 55 S.Ct. 241, 248, 79 L.Ed. 446 (1935). In *Colorado Anti-Discrimination Commission v. Case, supra,* we noted that

the general assembly "may not delegate power to make a law; but it may delegate power to determine some fact or a state of things upon which the law, as prescribed, depends." *Sapero v. State Board of Medical Examiners,* 90 Colo. 568, 11 P.2d 555 [1932]; *Prouty v. Heron,* 127 Colo. 168, 255 P.2d 755 [1953].

380 P.2d at 43.

Such a legislative delegation of power to an administrative agency is valid only if the legislature has provided sufficient standards to guide the agency's exercise of that power. *Elizondo v. State,* 194 Colo. 113, 570 P.2d 518, 521 (1977) (and cases cited therein). Failure to provide sufficient standards renders a legislative delegation of power invalid. *Panama Refining Co. v. Ryan, supra.* In *Panama Refining,* the United States Supreme Court invalidated a congressional delegation to the Presi-

---

**7.** Art. II, Sec. 25 provides: "No person shall be deprived of life, liberty or property without due process of law."

**8.** Art. V, Sec. 1 provides: "The legislative power of the state shall be vested in the general assembly consisting of a senate and house of representatives, both to be elected by the people. . . ."

dent of certain powers to regulate interstate shipment of oil because Congress had neither stated a policy, nor provided any specific standards to guide the President. The Court held that to leave "the matter to the President without standard or rule, to be dealt with as he pleased," violated separation of powers. *Id.* 293 U.S. at 418, 55 S.Ct. at 247. *See also Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936). Limits on delegation of legislative power are founded on the rationale that in a democratic system, legislative decisions must be made by that branch of government which represents the popular will and is accountable to it. *L. Tribe, American Constitutional Law*, § 5–17 at 286 (1978). *See Casey v. People*, 139 Colo. 89, 336 P.2d 308 (1959).

The defendant argues that the discretion accorded the prosecutor in deciding whether or not to charge an eligible offender under the habitual criminal statute constitutes an impermissible delegation of the legislative power to define criminal conduct.[9] If the habitual criminal statute delegated to prosecutors the power to define criminal conduct then it might run afoul of separation of powers limitations. As we stated in *Casey v. People*, 139 Colo. 89, 336 P.2d 308 (1959), "Only the legislature may declare an act to be a crime." The legislature may not delegate this power to administrative officials, nor may it "delegate to any administrative agency 'carte blanche' authority to impose sanctions or penalties for violation of the substantive portion of a statute." *Colorado Anti-Discrimination Commission v. Case, supra*, 380 P.2d at 43. *See Elizondo v. State, supra.*

However, the prosecutor does not define the offense of being an habitual criminal. Rather, his role is to evaluate the conduct of an offender and to decide, given this conduct and numerous other factors, whether to prosecute an individual under the statute. Like other criminal statutes, the habitual criminal statute is couched in mandatory terms but not uniformly enforced against every eligible offender. The prosecutor's discretion under the habitual criminal statute to bring charges against eligible offenders is indistinguishable from the discretion accorded a prosecutor in all criminal prosecutions.

■ It has long been recognized that criminal prosecutors may exercise uniquely broad discretion in charging offenders, and that this broad discretion does not exceed the permissible delegated power of the executive. As the United States Supreme Court stated in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978):

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury generally rests entirely in his discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448 [82 S.Ct. 501, 7 L.Ed.2d 446].

*Id.* at 364, 98 S.Ct. at 668.

This broad discretionary power is justified by the need to preserve flexibility and freedom of action. *See Breitel, Control in Criminal Law Enforcement*, 27 U.Chi.L. Rev. 427, 428, 435 (1960). In *Elizondo v. State, supra*, we recognized the frequent necessity, even in the non-criminal context, of preserving flexibility, stating:

---

**9.** A related separation of powers issue is whether the habitual criminal statute impermissibly delegates to the prosecutor the judicial responsibility to impose sentence. In *People v. Childs, Jr.*, 199 Colo. 436, 610 P.2d 101 (1980) we rejected this argument brought with respect to section 16–11–309, C.R.S.1973 (1978 Repl. Vol. 8; current version in 1981 Supp.), which mandates an enhanced sentence for crimes of violence. We find *Childs* dispositive of this issue with respect to the habitual criminal statute as well.

Where the power to be exercised relates to regulations under the police power, and it is impracticable to fix rigid standards without destroying the flexibility necessary for administrative officials to carry out the legislative will, we have approved statutes providing only rather broad and general standards for administrative action.

570 P.2d at 520. The need for flexibility is uniquely present in criminal prosecutions in light of the numerous factors affecting the decision whether to prosecute and the limited resources available for administering criminal justice. *See Breitel, Control in Criminal Law Enforcement, supra.*

 Of course, as the Supreme Court recognized in *Bordenkircher v. Hayes, supra,* "broad though [prosecutorial] discretion may be, there are undoubtedly constitutional limits upon its exercise." 434 U.S. at 365, 98 S.Ct. at 668. Certainly, proof that charging decisions were based upon an unjustifiable standard such as race or religion would support a constitutional challenge to such discretion. *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). *See K. Davis, Discretionary Justice: A Preliminary Inquiry* (1969). The defendant makes no allegation that the prosecution's decision to file habitual criminal charges in this case are based on such an unconstitutional classification. Given the traditionally broad discretion exercised by prosecutors in charging criminal offenders, the discretion allowed under the habitual criminal statute does not constitute an unlawful delegation of legislative power. We determine that the defendant's constitutional challenges to the habitual criminal statute, section 16–13–101(2), are without merit.

Judgment affirmed.

ERICKSON, J., specially concurs.

QUINN, J., dissents.

ERICKSON, Justice, specially concurring:

I concur with the result reached in part I of the majority opinion except as to the interpretation of Crim.P. 16, and concur with the remainder of the opinion. In my view, the defendant's due process rights were not abridged by his lack of access to the victim's statement relating to pregnancy. Since the prosecution did not suppress evidence favorable to the defense, but made the information known to the court, the constitutional mandates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) were met. The letter in its entirety should have been made available to defense counsel, but the error was, in my opinion, harmless.

The aim of compelling discovery of evidence in a criminal case is to avoid surprise and to guarantee that the accused has a fair trial. Reversal is mandated only where the undisclosed information might have affected the outcome of the trial. *People v. Thatcher,* Colo., 638 P.2d 760 (1981). *See also United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). The failure to order discovery of the omitted portion of the letter in this case could not, in my opinion, have affected the outcome of the trial. Since no constitutional violation occurred, the trial court's error was, in my view, harmless. *Cf. Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *People v. Myrick,* Colo., 638 P.2d 34 (1981). The facts in this case do not require that the case be remanded to the district court for an evidentiary hearing.

QUINN, Justice, dissenting:

I respectfully dissent from Part I of the court's opinion, which holds that reversible error did not occur in denying the defendant access to a portion of the victim's letter to the district attorney. In my view the excluded portion of the letter was no less relevant for discovery purposes under Crim.P. 16 than the parts which were disclosed and, for this reason, I believe the trial court erred in denying disclosure of the letter in its entirety. The proper procedure is to remand for an evidentiary hearing on whether the court's discovery ruling constituted harmless or prejudicial error.

The prosecutor in this case did not suppress evidence favorable to the defense and thereby implicate a due process claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Nor does the case in its present posture involve prosecutorial tolerance of perjured testimony, as was present in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Rather, the prosecutor in this case disclosed the victim's letter to the court for an *in camera* review. It was the court which denied discovery to the defendant because it believed the excised portion of the letter was neither relevant nor exculpatory. In so doing the court applied an unduly restrictive standard of disclosure to a defendant.

Crim.P. 16(a)(1)(I), Part I, requires the prosecution to disclose to defense counsel the relevant written or recorded statements of witnesses whom the prosecuting attorney intends to call at trial. A witness' statement need not relate directly to the critical elements of the crime in question nor be expressly exculpatory to qualify for discovery under Crim.P. 16. Often, impeachment evidence will play as large a role in determining the outcome of a trial as evidence which is either substantive or exculpatory in character. *Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). In *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the United States Supreme Court rejected the government's suggestion that records of electronic surveillance should be screened *in camera* by the trial judge to determine their arguable connection with the government's case before ordering their disclosure to an accused, and cogently observed:

"An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstance. Unavoidably, this is a matter of judgment, but in our view the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court to identify those records which might have contributed to the Government's case." 394 U.S. at 182, 89 S.Ct. at 971, 22 L.Ed.2d at 192.

The lesson of *Alderman* is that in some cases only defense counsel can determine what is material and helpful to the defendant's case. *People v. Smith*, 185 Colo. 369, 524 P.2d 607 (1974). It is not for us in this case to speculate whether and in what manner defense counsel might have used the portion of the statement relating to the witness' pregnancy to impeach her credibility. It is sufficient to point out that if the excised statement regarding the witness' pregnancy was indeed false, defense counsel arguably might have used the false statement to impeach the witness' credibility at trial.

"It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in [her] proper setting and put the weight of [her] testimony and [her] credibility to a test, without which the jury cannot fairly appraise them.... To say that prejudice can be established only by showing that cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial." *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624, 628 (1931).

*See also Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *People v. Page*, Colo., 625 P.2d 369 (1981). If the statement was true, the defendant nevertheless might be able to demonstrate how such information would have led to the discovery of evidence bearing on the substantive elements of the offense or on the witness' credibility. *See Giles v. Maryland, supra.*

Where, as here, the case turned on the credibility of witnesses and the defendant was deprived of any opportunity whatever to review the excised portion of the letter until the People filed their brief with this court, the record simply is inadequate to evaluate whether the defendant was prejudiced by the denial of pretrial discovery of the entire contents of the witness' letter. The proper procedure under these circumstances is to remand the case to the trial court for an evidentiary hearing on the issue whether the denial of discovery constituted harmless error. If the trial court finds that the failure to order discovery of the omitted portion of the letter had no likely effect on the outcome of the trial, as evaluated in the context of the entire record, then the trial court should deny the motion for a new trial and the case should be recertified to this court for resolution of the propriety of that ruling. *United States v. Agurs*, 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342, 355 (1976). "On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* If the court finds that the error was not harmless, then it should order a new trial. *See People v. Shaver*, Colo., 630 P.2d 600 (1981); *Huguley v. People*, 195 Colo. 259, 577 P.2d 746 (1978); *Compton v. People*, 166 Colo. 419, 444 P.2d 263 (1968).

Accordingly, I would remand the case to the trial court in order to enable it to make requisite findings of fact on the discovery issue raised on this appeal.